# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs June 2, 2016

## IN RE LILLIAN D.

### Appeal from the Juvenile Court for Knox County
### No. 143439    Timothy E. Irwin, Judge

---

### No. E2016-00111-COA-R3-PT-FILED-AUGUST 26, 2016

---

This is a termination of parental rights case involving a two-year-old child, Lillian D. ("the Child"). On October 7, 2013, the Knox County Juvenile Court granted temporary legal custody of the Child to the Tennessee Department of Children's Services ("DCS"). The Child was immediately placed in foster care, where she has remained since that date. DCS subsequently filed a petition to terminate the parental rights of the Child's biological mother, Penelope D. ("Mother"), in the Knox County Juvenile Court on January 26, 2015.[1] Following a bench trial, the trial court terminated Mother's parental rights to the Child after determining by clear and convincing evidence that Mother was mentally incompetent to care for the Child and that the conditions that led to the removal of the Child from Mother's custody still persisted. The trial court further found by clear and convincing evidence that terminating Mother's parental rights was in the best interest of the Child. Mother has appealed. Discerning no error, we affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which ANDY D. BENNETT, J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Mary L. Ward, Knoxville, Tennessee, for the appellant, Penelope D.[2]

Herbert H. Slatery, III, Attorney General and Reporter, and Kathryn A. Baker, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

---

[1] Termination of the biological father's parental rights was sought by separate action.

[2] We note that in its final order, the trial court listed "Vaneta A." as a prior name for Mother. Inasmuch as the Child's birth certificate and the trial court's judgment refer to Mother as Penelope D., we will refer to Mother as Penelope D. or Mother for purposes of this Opinion.

**OPINION**

**I. Factual and Procedural Background**

The Child was removed from the custody of Mother when she was only three days old due to Mother's mental health condition, which compromised her ability to care for the Child. At the hospital following the Child's birth, medical staff became concerned when Mother appeared to be suffering from delusions. Following a psychiatric consultation, hospital personnel concluded that Mother was suffering from delusions and, due to her condition, was not able to safely care for the Child. The Child was placed in foster care on October 7, 2013, by order of the Knox County Juvenile Court ("trial court"). The trial court adjudicated the Child as dependent and neglected on April 8, 2014, "due to the mother's mental health issues which create[d] an inability for the mother to provide appropriate care and supervision for the child."

Following the child's removal, Mother told a DCS case manager, Kim Harvey, details of certain events in Mother's past. Throughout her involvement with DCS, Mother had shared her story with other professionals, remaining fairly consistent but including some factual variations. Mother stated that she was born on a U.S. Navy ship in international waters to her parents, Katherine Gyorgyi and Alberto Delarosa. According to Mother, her mother was a naval surgeon and her father was an imperial in the Marines. After her father's death, her mother was remarried to a man named Jack Gardner, who was a commander prince in the Navy. Mother further related that she had been hospitalized in Ireland as an infant due to Marfan Syndrome. She reported spending time in foster care as a child following the death of both parents. By Mother's account, she had been kidnapped in Tennessee and taken to Florida at the age of five where she was adopted by a family named "Collinswood."

Mother further reported suffering a heart attack in the fifth grade and remaining in a coma until she was sixteen years old. As Mother explained, she was taken from foster care at sixteen years of age by a man named Arthur Howe, whom she married in order to be emancipated. She further reported giving birth to twenty-two children in addition to the Child, including Ellison who died at eight weeks due to a heart condition and three separate sets of septuplets with Mr. Howe. Mother explained that the last set of septuplets was born after Mr. Howe's death in 2002 when she inseminated herself with a turkey baster. Mother said that the three sets of septuplets currently lived with a relative named Magdalena.[3]

---

[3] Mother testified at trial that Magdelena was her cousin, but Ms. Harvey testified that Mother previously told her that Magdelena was her aunt.

Ms. Harvey testified that she searched and contacted multiple resources in an attempt to locate Mother's family, including the Thomson Reuters CLEAR investigation database, local missing person programs, Tennessee Department of Vital Records, Knoxville Police Department, Knox County Sheriff's Office, Tennessee Bureau of Investigation, the Federal Bureau of Investigation, U.S. Department of State, U.S. Department of Naval Services, and the U.S. Embassy in Ireland. According to Ms. Harvey, despite searching foster care records in Tennessee, Georgia, and Florida, she was unable to locate any records regarding Mother's reported time in foster care. Ms. Harvey facilitated a voluntary national fingerprint search that produced one record pertaining to an arrest of Penelope D. occurring in Georgia, but no identifying information was available from that arrest record.

Upon the Child's placement into the custody of DCS, a permanency plan was developed for the Child on April 30, 2014, listing the alternate goals of "Return to Parent" or "Adoption." The permanency plan required Mother to: (1) cooperate with DCS to obtain legal identifying documentation regarding Mother's identity; (2) complete a full psychological evaluation and follow all treatment recommendations until released from treatment upon successful completion; (3) if prescribed, take medication as prescribed; (4) complete a parenting assessment; (5) demonstrate the ability to perform basic parenting skills during visits; (6) attend medication management appointments; (7) attend individual therapy to address her past trauma; (8) provide a safe, stable home for the Child; (9) maintain contact with DCS; and (10) notify DCS of any change in Mother's circumstances. It is undisputed that Mother made efforts to comply with her permanency plan throughout her involvement with DCS. Specifically, Mother participated in individual therapy, medication management, a full psychological evaluation, and a parenting assessment.[4]

In March 2014, Mother underwent a psychological evaluation performed by a clinical psychologist, Dr. William A. McGillivray, Ph.D., ABPP. During this evaluation, Mother was diagnosed with Psychotic Disorder, not otherwise specified, with rule-out diagnoses of bipolar disorder and schizophrenia. Although Dr. McGillivray attempted to obtain information from Mother concerning her background, he was unable to do so. His evaluation described his interview with Mother as follows in relevant part:

> There is virtually no reliable information about [Mother] and the consistent parts of her story are implausible, including the circumstances of her birth, where she lived growing up, with whom she lived following the death of both parents one year after her birth, and on and on. Her

---

[4] DCS pled substantial noncompliance with the permanency plan as a ground in the petition to terminate Mother's parental rights. At trial, however, DCS conceded that Mother had substantially complied with the permanency plan, and DCS has not raised any issue on appeal with regard to that statutory ground.

explanation for the many gaps in her life history and the absence of any record of her life is also implausibly explained as being due to brain injury that has affected her memory and the loss of all documentation of her life by theft.

* * *

As may be clear from the above, I do not believe I made any progress in gaining a better understanding of this woman's life, life circumstances, or motivation for her bizarre recounting of her life.

* * *

The tenacity of her delusions (unless she is lying) is remarkable as is her ability to mix seemingly factual information (albeit often inaccurate) with unbelievable claims. The fact that she has blocked every avenue[] to determine her identity does suggest that some conscious deceit is involved; but I believe any deceit coexists with genuine delusion.

According to Dr. McGillivray, psychological testing revealed "evidence of a serious impairment to [Mother's] ability to think logically and coherently." Testing also showed that situation-related stress was placing higher demands on Mother than she had been accustomed to confronting. As a result, Dr. McGillivray determined that "[Mother] is at risk for becoming acutely upset and for functioning ineffectively in the decisions she makes and the courses of action she pursues." Dr. McGillivray concluded that Mother may be indifferent to people and inattentive to what they are saying or doing. He maintained that Mother's overly emotional and insufficiently deliberative approach "often compromises the effectiveness of [her] problem solving and the adequacy of [her] adjustment." Dr. McGillivray concluded as follows:

This is a difficult case. [Mother's] delusions are certainly all encompassing, although there may also be an element of deception, given her presentation of self as *sui generis*, that is, without any connection to real past. At the same time, she appears able to function [o]n a daily basis and her reality testing is sufficient to manage her affairs in a limited manner. From the supervised visits, [Mother] appears able to attend to her child's needs (again, for a limited period and limited possible needs she would need to meet under the circumstances).

[Mother] is completely indifferent, *la belle indifference* in the old psychiatric literature, marking a kind of hysterical refusal to take what she

4

is saying seriously. . . . There is a kind of manic quality in her delusions as opposed to themes of world destruction and/or omnipotence in schizophrenic delusions. The possibility should be considered that she has Bipolar Disorder.

To add to the mystery, [Mother's] claim of multiple insults to her brain, once from a long-lasting coma, once from a severe automobile accident does suggest that her mental status may be connected to brain injury. The only evidence besides her own assertions is her significant difficulty noted on the WAIS and W-J in working with dispatch.

What remains clear is that [Mother] clearly is mightily unstable in her living and financial circumstances and the mystery of her origins leads me to conclude she would not be very reliable in caring for her child at this time. I would recommend that she would need to have a longer track record of even modest stability before visits with her child be extended. Whether there can or should be more pressure on her to divulge her past or to allow an investigation by authorities such as the FBI is something DCS might consider if permissible.

I will conclude that at this point [Mother] is almost totally unbelievable in her ideas, beliefs or intentions. Although seemingly able to function on a daily basis, albeit with significant help from social services, I have no sense that she would be able to form a relationship of trust, for example, with [Family Service Worker]. Perhaps in time "more shall be revealed" and the possibility of a more reliable relationship may develop.

Mother's parenting assessment was performed by Leigh Ann Goldstein, a licensed professional counselor, and René Stegall, M.S., Omni Community Health case manager for Mother. As Ms. Goldstein began the parenting assessment, Mother became agitated by questions regarding her family history when Ms. Goldstein was completing the genogram portion of the assessment. Mother suggested that because Ms. Goldstein did not believe her, she refused to work further with Ms. Goldstein. Ms. Stegall testified that she finished the genogram and the remaining parts of the assessment with Mother. Calling upon her master's degree and thirty years of social work experience, Ms. Stegall related that Mother frequently became agitated when she was "being put on the spot" and would become further agitated if someone did not believe her or pointed out the inconsistencies in her story. Ms. Stegall recommended that Mother not be questioned during visits to prevent upsetting her with the Child present. Having observed Mother's supervised visitation with the Child, Ms. Stegall testified that Mother was appropriate with the Child during these visits. At one visit supervised by Ms. Stegall, however,

Mother arrived in a "very agitated state." According to Ms. Stegall, Mother indicated that the Child's father was spreading rumors about her, and that she was previously "running from people in the downtown area of Knoxville" when "people were shouting, 'whore' and other things." The assessment revealed that Mother remained agitated during the entire visit. Mother offered that she "'was going to have to leave the state, find another place to live and go into hiding.'" Ms. Stegall recommended that Mother continue to maintain mental health services and be mentally healthy on a long-term basis before the Child's return to Mother.

Ms. Goldstein's testimony included the importance to a healthy child of having a "mentally functional, non-delusional parent." Ms. Goldstein holds a master's degree in counseling from the University of Tennessee and is licensed as a professional counselor through the State of Tennessee. According to Ms. Goldstein, her career had focused on interactions between parents and children. During trial, Ms. Goldstein opined in pertinent part:

> [I]t's extremely important to a child's ability to have successful interchanges with [her] environment, that [she has] a parent who has the ability to be attuned to, anticipate, acknowledge and appropriately meet [her] emotional needs. When you have a parent that struggles with severe mental illness, those needs take precedence over the child, which places the child at risk.

In Ms. Goldstein's proffered opinion, it would be difficult for a child to establish a sense of reality if raised by a delusional parent because the child's reality would shift according to the reality of the parent. Significantly, Ms. Goldstein differentiated between a child having a delusional caretaker and having occasional contact with a delusional relative. According to Ms. Goldstein, a child with a delusional caregiver would have to trust that caregiver to meet her needs. Conversely, a child having occasional contact with a delusional relative can obtain corrective information from a stable caregiver, which would not be harmful to the child.

During trial, Mother again articulated a review of her life and background as Penelope D. Mother's explanation was substantially consistent with the previous narratives she had provided throughout her involvement with DCS. During the first day of trial, DCS informed Mother that they had located her parents, Marsha S. and Brad S. (collectively, "Maternal Grandparents"), in Florida. DNA testing during the pendency of the case established that Maternal Grandparents were the biological grandparents of the Child. Mother, however, denied that they were her parents, insisting that her parents were deceased. Instead, Mother maintained that Maternal Grandparents were distant relatives from her mother's side of the family. According to Mother, "[Maternal

Grandparents were] extremely abusive mentally and physically, and I don't want them anywhere near my children because I think that it would be detrimental to their health." Mother related that Maternal Grandparents lied to her about who her parents were and still refused to tell her the truth. When questioned as to why she did not like Marsha S., Mother stated, "Because she made up false tales regarding what my childhood was . . . . She for a while pretended to be my mother and she's not. She pretended to be my sister's mother, and she's not alive anymore. And she just generally makes things up."

Although insisting at trial that she was residing in an apartment located in a house, Mother did not present a lease. Notwithstanding Mother's claim of employment, it was undisputed that Mother's employment did not constitute a legal source of income due to her lack of proper identification and Social Security number. According to Mother, her lack of identification and birth records limited her options for employment.

At trial, Brad S. identified himself as Mother's biological father. Marsha S. also testified, acknowledging that she was Mother's biological mother. Maternal Grandparents testified that Mother's name was in fact Vaneta A. and not Penelope D. They first discovered that Mother was using the name Penelope D. in 2007 or 2008. Regarding other family members, Maternal Grandparents explained that Mother had three brothers but not a sister. Although lacking a birth certificate for Mother, they presented Mother's Social Security number and Florida driver's license.[5] When questioned, Maternal Grandparents, speaking as the only caretakers responsible for Mother's care as a child, denied any kind of abuse or trauma to Mother or that Mother was ever placed in foster care as a child.

DCS presented evidence demonstrating that Mother has two biological children residing in Florida: S.A., fourteen years of age, and C.A., eight years of age. Records from the respective child welfare agency in Florida reveal that S.A. was removed from the custody of Mother in 2005, when Mother was determined to be delusional and paranoid and verified indicators for threatened harm were found. Mother was homeless at the time. According to the Florida agency's records, Mother took S.A. to various medical providers, claiming that someone had bitten S.A. on the vagina, but no medical evidence was present to support the claim. S.A. was later released to the custody of her father, where she remained according to Maternal Grandparents.

---

[5] According to Maternal Grandparents, Mother had no birth certificate. They maintained that Mother was born at home and that the doctor did not submit the paperwork for a birth certificate. As explained by Brad S., they did not obtain birth certificates or social security numbers for Mother and her siblings in order to "protect them from Uncle Sam." According to Brad S., Mother was enrolled in school without a birth certificate. Although Maternal Grandparents purportedly arranged for Mother to obtain a birth certificate, Mother would not cooperate because she refused to have her photograph taken. Marsha S. testified that she assumed Mother would follow through and obtain a birth certificate when needed.

Florida agency records also reflect that Mother and C.A. were found sleeping in a vehicle in front of an individual's home. Mother appeared delusional at that time, and her statements were "inconsistent with reality." The child welfare agency and law enforcement became involved, which resulted in C.A.'s release to her biological father. Although Maternal Grandparents assisted C.A.'s father in obtaining custody of C.A., they opined that this action resulted in their estrangement from Mother. Marsha S. testified that when Mother lost custody of C.A., "[Mother] broke." At trial, when Mother was shown photographs of her children, she incorrectly identified them. When Mother was presented photographs of herself and her biological children, she claimed the pictures were either of her and one of her fictitious children, Rhiann, or of Mother's fictitious sister and niece. Despite DNA testing and testimony by Maternal Grandparents, Mother continued to deny her identity and her family, including her two oldest children.

In a letter received by DCS approximately three weeks before the second day of trial, Mother's current therapist, Kimberly Rickerson, observed that Mother had made progress by beginning to take medication for bipolar disorder that had "assisted in creating some stability in [Mother's] emotional state."[6] Ms. Rickerson also wrote that Mother continued to insist that Marsha S. was not her mother and maintain that she was a "victim of the system." Ms. Rickerson informed Mother that DCS would need to observe signs of long-term stability from Mother prior to any reunification with the Child. Ms. Rickerson recommended a psychiatric evaluation to determine a "more appropriate medication combination" for Mother. Ms. Rickerson also stated that Mother was "emotionally fragile" and that a termination of her parental rights could cause Mother to suffer "severe depression."

A DCS case manager, Stephanie Grissom, testified at trial that as she had supervised visits between Mother and the Child, they were "some of the best visits [she has] supervised." Although Ms. Grissom indicated that she was not concerned about the Child's safety during those visits, she explained on cross-examination that she had safety concerns stemming from Mother's mental health that prevented her from recommending unsupervised visitation. Stating that the Child was bonded to Mother through the supervised visits, Ms. Grissom opined that both Mother and the Child would be devastated if that relationship ceased. According to Ms. Grissom, however, the best long-term option for the Child was to be adopted by the foster parents, who desired to adopt her. As described by Ms. Grissom, the Child maintained a strong bond with the foster parents and had thrived since being in their home. Furthermore, the Child's foster parents were open to allowing Mother to continue a relationship with the Child after an adoption. According to Ms. Grissom, Mother had complied with the permanency plan

---

[6] Testimony established that Mother did not begin taking medication for her mental illness until April 2015.

developed in the case but was still delusional, telling fantastic stories about her life that contradicted her actual identity. Ms. Grissom explained that she did not believe Mother would be able to parent the Child in the near future due to Mother's significant mental illness.

Following two days of trial conducted on July 20, 2015, and October 5, 2015, the trial court entered a final order on December 15, 2015, terminating Mother's parental rights to the Child. The court found by clear and convincing evidence that (1) Mother was mentally incompetent and unable to care for the Child and (2) the conditions leading to the Child's removal from the home still persisted. The trial court further found by clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Child. Mother timely appealed.

## II. Issues Presented

Mother presents three issues for our review, which we have restated as follows:

1. Whether the trial court erred by terminating Mother's parental rights based upon the statutory ground of mental incompetence.

2. Whether the trial court erred by terminating Mother's parental rights based upon the statutory ground of persistence of conditions.

3. Whether the trial court erred in determining by clear and convincing evidence that the termination of Mother's parental rights was in the best interest of the Child.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); *See In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). As our Supreme Court has recently explained:

> The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decison terminating parental rights is "*final and irrevocable*"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).

> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.* 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

> * * *

> In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as

supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-524. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

## IV. Grounds for Termination of Parental Rights

Tennessee Code Annotated § 36-1-113 (Supp. 2016) lists the statutory grounds for termination of parental rights, providing in relevant part as follows:

(a)     The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

* * *

(c)     Termination of parental or guardianship rights must be based upon:

(1)     A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2)     That termination of the parent's or guardian's rights is in the best interests of the child.

The trial court determined that the evidence clearly and convincingly supported a finding of two statutory grounds to terminate Mother's parental rights: (1) mental incompetence pursuant to Tennessee Code Annotated § 36-1-113(g)(8) and (2) persistence of conditions pursuant to Tennessee Code Annotated § 36-1-113(g)(3). Both termination grounds found by the trial court were based on Mother's mental condition and how it inhibited her ability to care for the Child.

In its final judgment, the trial court found the following facts relevant to the grounds established for termination of Mother's parental rights:

I

[The Child] was born out of wedlock to Penelope [D.] . . . in Knox County, Tennessee. . . . The temporary custody of this child was awarded to the State of Tennessee, Department of Children's Services, on October 7, 2013, by order of the Juvenile Court of Knox County, Tennessee; she has been in foster care continuously since that date. An order finding the child dependent and neglected was issued by this Court following a hearing on April 8, 2014. The termination petition was filed against [Mother] on January 26, 2015.

II

1. [The Child] was removed from her mother's custody due to [Mother's] mental health issues which create an inability for the mother to provide appropriate care and supervision for the child. When [the Child] was born, medical staff at the hospital became concerned about the mother's mental health and whether she was well enough, from a mental health standpoint, to care for her newborn. The attending physician called for a psychiatric consult as the mother appeared to be significantly delusional. That consult concluded that the mother was actively suffering from one or more significant delusional disorders and that she could not safely care for the infant.

* * *

8. [Mother's] delusions about her identity and her history have been essentially the same throughout her involvement with the Department of Children's Services. So has her apparent interest in discovering the truth. . . .

9. One of the requirements on [Mother's] permanency plan was that she complete a full psychological evaluation. That evaluation was done by Dr. William McGillivray in March 2014. [Mother] was diagnosed with Psychotic Disorder, NOS; R/o Bipolar Disorder, Schizophrenia. During the evaluation she gave evidence of a serious impairment in her ability to think logically and coherently. The evaluator recommended that she receive intervention focused on helping her improve the clarity of her thinking. He concluded:

12

This is a difficult case. Her delusions are certainly all encompassing, although there may also be an element of deception, given her presentation of self as *sui generis*, that is, without any connection to real past. . . .

She is completely indifferent, *la belle indifference* in the old psychiatric literature, marking a kind of hysterical refusal to take what she is saying seriously. . . There is a kin[d] of manic quality in her delusions as opposed to themes of world destruction and/or omnipotence in schizophrenic delusions. The possibility should be considered that she has Bipolar Disorder.

To add to the mystery, her claim of multiple insults to her brain, once from a long-lasting coma, once from a severe automobile accident does suggest that her mental status may be connected to brain injury. . .

What remains clear is that she clearly is mightily unstable in her living and financial circumstances and the mystery of her origins leads me to conclude that she would not be very reliable in caring for her child at this time.[]

10. Other requirements of the permanency plan include that Respondent [p]articipate in individual therapy. [Mother] has received ongoing individual counseling at The Solution Source at the Department's expense. She has been compliant with treatment to the extent that she has kept all her appointments but, as evidenced by her testimony during this trial, she has made no progress in addressing her delusions. She recognizes that she has issues to address, but she is unable or unwilling to address them. She has been compliant with medication management through Cherokee since April 2015. She was required to obtain appropriate housing. She was unable to qualify for public housing due to her lack of identification. She stayed with various individuals until she recently obtained an apartment in a house. She still has no lease and, thus, no stability though there is no reason to believe she cannot remain there

indefinitely. . . . [Mother] was also asked to complete a parenting assessment and to demonstrate parenting skills during visitation. The evidence was uncontroverted that [Mother] is a very loving mother, attentive to her child and prepared for visits. . . .

11. During a break on the first day of trial, [Mother] was advised that the Department of Children's Services had finally been successful in identifying and locating her biological parents, Brad and Marsha S[.] Rather than being excited by the ultimate success of the Department's extensive efforts, [Mother] became very upset. She testified that this was not good news and that "they're not my parents. . . . My biological parents are deceased. . . ."

12. Brad S[.] testified by speakerphone from Florida on the first day of trial and then traveled to Knoxville to testify in person on the second day. Marsha S[.] did the same. They identified themselves as [Mother's] biological parents. DNA testing conducted with [the Child] between the two days of trial confirmed this relationship. [Maternal Grandparents] stated that [Mother's] actual name is Vaneta [A.], named after two of her great-grandmothers. She never had a sister. . . .

13. Vaneta (aka Penelope) was born . . . in South Bench, Indiana. The family moved to Florida in 1985 where they lived in several different cities based on [Brad S.'s] work, settling in Fort St. Lucie in 1995. Vaneta (aka Penelope) never lived with anybody else and was never in foster care. She was described as a happy little person until she became a teenager. A high school counselor suggested that she was a willful child and needed counseling but her parents did not agree. When she was 15 or 16, she ran away with a band that came to town and her parents retrieved her a couple months later from Paducah, Kentucky. They never knew what happened during that time but saw that their child had changed. . . .

14. [Mother's] first child, [S.A.], was born in Florida [i]n . . . 2002. [S.A.] and [Mother] lived with [Maternal Grandparents] until [S.A.] was about 3. After an argument with [Marsha S.] over who was to care for [S.A.], [Mother] left with the toddler and went to a shelter. [S.A.] was removed from [Mother's] custody a few weeks later by the Florida child welfare agency after [Mother] was found to be delusional and paranoid, including making various fictitious

14

allegations of abuse to the child. [S.A.] was eventually released from foster care to the custody of her father. [Mother's] second child, [C.A.], was born in Florida [i]n . . . 2007. She was removed from [Mother's] custody in March 2008 after they were found sleeping in a car in someone's yard with no residence address and no means of support. [Mother] again appeared delusional. [C.A.] was immediately placed in the custody of her father . . . where she remains. It was about this time that [Mother] began using the name Penelope. [Mother] has not had ongoing contact with her parents since she lost [C.A.] They searched for her, but could not find her as she is an adult who did not want to be found.

* * *

17. Leigh Anne Goldst[ein], a licensed professional counselor, attempted to complete a parenting assessment with [Mother]. During Ms. Goldst[ein]'s attempt to obtain family history and a genogram, [Mother] became agitated and refused to cooperate further with Ms. Goldst[ein]. That assessment was completed by René Stegall, another employee of Omni Community Health. The details of [Mother's] history as related during this assessment vary from other stories, but the general outline is consistent with what she has told others and with her testimony during this trial. Ms. Goldst[ein]'s career has focused on interactions between parents and children. She testified as an expert witness to the importance of having a mentally functional, non-delusional parent. She stated that "it is extremely important to a child's ability to have successful interchanges with their environment, that . . . they have a parent who has the ability to be attuned to, anticipate, acknowledge and appropriately meet their emotional needs. When you have a parent that struggles with severe mental illness, those needs take precedence over the child, which places the child at risk." She agreed that it is difficult for a child to establish a sense of reality if being raised by a parent who is not in touch with reality. The child's reality shifts according to whatever the reality of the parent is.

* * *

19. Upon these facts, the Court finds that the child has been removed by order of this Court for a period of six (6) months; that the conditions which led to her removal still persist; other conditions persist which

in all probability would cause the child to be subjected to further abuse and neglect and which, therefore, prevent the child's return to the care of [Mother]; there is little likelihood that these conditions will be remedied at an early date so that this child can be returned to [Mother] in the near future; the continuation of the legal parent and child relationship greatly diminishes the child's chances of early integration into a stable and permanent home.

20. The Court further finds that [Mother] is incompetent to adequately provide for the further care and supervision of the child because [Mother's] mental condition is presently so impaired and is so likely to remain impaired that it is unlikely that [Mother] will be able to assume the care of and responsibility for the child in the near future.

21. This is not your everyday termination case. There is no villain here. [Mother] is certainly mentally ill. She is delusional. She has proven that through her own testimony. The Court cannot get past her testimony about her identity and history, her 22 fictitious children, and her two other real children. None of this is based in reality. Her refusal to accept her actual identity has cut her off from her family, including her two older children and her siblings, and has hampered her ability to provide for her own basic needs. According to all the witnesses, she is currently doing the best she's done. But that best does not include any diminution of her mental illness. She recently found a place to live and she has supportive, sheltered employment. She provides excellent care for [the Child] under supervision. The Court, however, cannot trust her ability to meet even her own needs when given the added burden of a two-year-old. She lost two other children under similar circumstances in the past and she was not as sick then as she is now.

22. [The Child] needs stability. She needs to know what to expect every day, to know where she is going to lay her head at night. She must be able to develop a sense of her own identity in the context of loving adults who are in touch with reality and can provide that secure base for her.

Having carefully reviewed the evidence and record in this action, we shall address each statutory ground in turn.

16

A. Mental Incompetence

Mother contends that the trial court erred by terminating her parental rights based upon the statutory ground of mental incompetence. Tennessee Code Annotated § 36-1-113(g)(8) provides as a ground for termination:

(8)(A) The chancery and circuit courts shall have jurisdiction in an adoption proceeding, and the chancery, circuit, and juvenile courts shall have jurisdiction in a separate, independent proceeding conducted prior to an adoption proceeding to determine if the parent or guardian is mentally incompetent to provide for the further care and supervision of the child, and to terminate that parent's or guardian's rights to the child;

(B) The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:

(i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future; and

(ii) That termination of parental or guardian rights is in the best interest of the child;

(C) In the circumstances described under subdivisions (8)(A) and (B), no willfulness in the failure of the parent or guardian to establish the parent's or guardian's ability to care for the child need be shown to establish that the parental or guardianship rights should be terminated.

The General Assembly's elimination of the requirement of willfulness from the statute "serves to protect children from harm caused by a parent who is incapable of safely caring for them." *See In re D.A.P.*, No. E2007-02567-COA-R3-PT, 2008 WL 2687569, at *5 (Tenn. Ct. App July 9, 2008). If willfulness were required in order to terminate parental rights for mental incompetence, "an obvious result . . . is to condemn a child, whose parents are unfit to properly care for the child because of mental illness, to a life in serial foster homes without any possibility of a stable, permanent home." *See State, Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990).

This Court has rejected the argument that the ground of mental incompetence is reserved only for parents who have "a condition for which 'no amount of intervention can assist'" and instead has affirmed the termination of parental rights for mental disorders such as bipolar disorder, adjustment disorder with anxiety and depressed mood, dependent personality disorder, and schizophrenia disorder. *See id.* at 337-39 (affirming the termination of parental rights of a parent diagnosed with schizophrenic disorder on the basis of mental incompetence, although the acts of the mentally disabled parent were not willful); *In re S.M.R.*, No. M2008-01221-COA-R3-PT, 2008 WL 4949236, at *6 (Tenn. Ct. App. Nov. 18, 2008) (affirming a termination of parental rights on the statutory ground of mental incompetence when the parent was diagnosed with bipolar disorder and personality disorder, not otherwise specified); *Dep't of Children's Servs. v. M.R.N.*, No. M2006-01705-COA-R3-PT, 2007 WL 120038, at *10 (Tenn. Ct. App. Jan. 17, 2007) (affirming a termination of parental rights on the statutory ground of mental incompetence based on a diagnosis of adjustment disorder with anxiety and depressed mood, as well as dependent personality disorder). The parent's mental condition, however, must impair the parent to an extent that he or she cannot adequately provide for the care and supervision of the child. *See* Tenn. Code Ann. § 36-1-113(g)(8)(B)(i).

In the instant action, Mother has a long history of mental illness. In 2005 and 2008, Mother lost custody of her two oldest children in Florida due to her mental condition and her inability to care for those children. Mother denied the existence of those two children at trial. In October 2013, the Child was removed from Mother's custody due to Mother's mental health issues, which interfered with her ability to care for the Child. Even upon the conclusion of trial, Mother continued to deny her real identity and parentage, despite a DNA test establishing that Maternal Grandparents were the biological grandparents of the Child. The evidence demonstrates that Mother's delusions continued into a visit with the Child on at least one occasion when Mother appeared agitated and made statements that she was going to run away and go into hiding.

In determining that Mother's mental condition rendered her unable to care for the Child, the trial court relied heavily on Mother's testimony at trial and her continued delusions concerning her identity. The evidence preponderates in favor of this determination. Despite efforts by Mother, the evidence demonstrated that her condition was unlikely to be remedied at any point in the near future to allow Mother to resume care and responsibility for the Child. As to this issue, Ms. Goldstein testified regarding the effect Mother's delusions would have on the Child, opining that having a delusional parent would put the Child at risk. The trial court found that Mother was "compliant with treatment to the extent that she has kept all her appointments but, as evidenced by her testimony during this trial, she has made no progress in addressing her delusions." As the trial court found, "[Mother's] refusal to accept her actual identity has . . . hampered her

18

ability to provide for her own basic needs" and called into question Mother's "ability to meet even her own needs when given the added burden of a two-year-old."

We acknowledge and commend Mother on her efforts in attempting to overcome her mental illness. Following a thorough review of the record, however, we conclude that the evidence does not preponderate against the trial court's finding by clear and convincing evidence that Mother was incompetent to adequately provide for the care and supervision of the Child. Mother's mental condition is presently and is likely to remain so impaired that it is unlikely Mother will be able to assume care of and responsibility for the Child in the near future. Therefore, we affirm the termination of Mother's parental rights based on the statutory ground of mental incompetence.

## B. Persistence of Conditions

Mother contends that the trial court erred in finding clear and convincing evidence of the ground of persistence of conditions in this case. Specifically, Mother argues that DCS presented no evidence to the court that Mother was unable to meet the needs of the Child. Mother also argues that she has made "substantial progress" during the pendency of this case. While we recognize that Mother has made efforts to remedy her mental condition by attending therapy and, more recently, beginning medication for her condition, we agree with the trial court that the conditions leading to removal still persisted at the time of trial.

Tennessee Code Annotated § 36-1-113(g)(3) provides as an additional ground for termination of parental rights:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home; . . .

As the record reflects and the trial court found, the Child was removed from the custody of Mother on October 7, 2013, due to Mother's mental health, resulting in Mother's inability to care for the Child. The Child was adjudicated to be dependent and neglected on April 8, 2014, by the trial court due to Mother's mental health issues and Mother's inability to care for the Child. We have determined in this Opinion that the evidence preponderates in favor of the trial court's finding that Mother's delusions still persisted at the time of trial, rendering her mentally incompetent to care for the Child.

This Court has previously determined that the ground of persistence of conditions can be based on a parent's mental incapacity. *See In re B.S.G.,* No. E2006-02314-COA-R3-PT, 2007 WL 1514958, at *7 (Tenn. Ct. App. May 24, 2007) ("A parent's mental incapacity can provide a sufficient factual predicate for a finding that persistent unremedied conditions exist which prevent the safe return of the child or children to that parent's care."). In this case, despite efforts by both DCS personnel and Mother, the reason for removal of the Child from Mother's care (Mother's mental incapacity) still persisted at the time of trial. Additionally, the trial court found that it was unlikely this condition would be remedied at any point in the near future so that the Child could return to Mother's custody. The court further found that continuation of the parent/child relationship between the Child and Mother greatly diminished the Child's chances of early integration into a stable and permanent home.

Following a thorough review of the record, we conclude that the evidence supports the trial court's finding that DCS has proven the ground of persistence of conditions by clear and convincing evidence. While Mother had received medication and therapy at the behest of DCS case managers, her mental condition had not improved by the time of trial such that she was capable of safely caring for the Child. Furthermore, testimony demonstrated that Mother's mental condition would be unlikely to improve in the near future so as to allow the Child to return to Mother's custody. Continuation of the parent/child relationship would therefore greatly diminish the Child's chances of integration into a safe and stable permanent home. The trial court properly terminated Mother's parental rights based on clear and convincing evidence of this statutory ground.

## V. Best Interest of the Child

When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182

S.W.3d 838, 877 (Tenn. Ct. App. 2005); *see also In re Carrington H.*, 483 S.W.3d at 507, 523 (Tenn. 2016) ("'The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination.'") (quoting *In re Angela E.*, 303 S.W.3d 240, 254 (Tenn. 2010)).   Tennessee Code Annotated § 36-1-113(i) (Supp. 2016) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest.  *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's.  *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

(1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

21

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

The trial court made the following findings of fact concerning the best interest analysis in relevant part:

> [The Child] is now described as a very smart, very happy child. She is bonded to her prospective adoptive family and excited to see them at the end of visits with her mother. They are providing her with that trusting, secure place where her emotional needs are being met and where she can develop with a clear sense of reality.

> * * *

> [The Child] needs stability. She needs to know what to expect every day, to know where she is going to lay her head at night. She must be able to develop a sense of her own identity in the context of loving adults who are in touch with reality and can provide that secure base for her.

> [Mother] has not made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in her home despite reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible. A change of caretakers and physical environment is likely to have a detrimental effect on the child's emotional and psychological condition. Most significantly, [Mother's] mental and/or emotional status would be detrimental to the child or prevent [Mother] from effectively providing safe and stable care and supervision for the child.

22

The Department of Children's Services has made reasonable efforts toward achieving permanency for this child.

It is, therefore, in the best interest of [the Child] and the public that all of [Mother's] parental rights to this child be terminated and the complete custody, control, and full guardianship of the child be awarded to the State of Tennessee, Department of Children's Services, with the right to place her for adoption and to consent to such adoption in loco parentis.

(Emphasis and paragraph numbering omitted.)

This Court addressed a similar situation in *State of Tennessee, Dep't of Children's Servs. v. Oliver*, No. M2007-00844-COA-R3-PT, 2007 WL 4553036 (Tenn. Ct. App. Dec. 26, 2007). In *Oliver*, this Court acknowledged that the parents had not actively abused the children and that they made substantial efforts to complete the requested classes, visit the children regularly, and maintain a relationship with the children. *Id.* at *9. Despite those efforts, this Court affirmed the trial court's finding that the parents in that case were unable mentally to care for the children and were unlikely to improve to a point where they would be capable of caring for the children. *Id.* In affirming the trial court's best interest finding, this Court reasoned as follows:

At this stage in the analysis . . . we must focus on the best interests of [the children]. We have observed:

[T]he statutes on termination of parental rights are established not only to protect a child from a parent who actively abuses him, but also to avoid the harm visited upon a child by spending years in the uncertainty of foster care because his biological parents are unwilling or unable to care for him properly, and yet will not voluntarily relinquish their parental rights so that the child will be available for adoption and a permanent home. Such parents may recognize that they are unable to shoulder the responsibility of caring for the child, but wish for a relationship with the child that does not require caring for the child's needs. The statutory scheme enacted evidences recognition by the Legislature that, unless the parental rights of such a parent can be terminated, a substantial number of children will spend their childhood in foster care, with no possibility of a permanent home.

*In re Marr,* No. M2001-02890-COA-R3-CV, 2003 WL 152640, at *10 (Tenn. Ct. App. Jan. 23, 2003), *judgment vacated for lack of standing,* 127 S.W.3d 737 (Tenn. 2004). We emphasized that the best interests of the child "must be evaluated in light of the statutory purpose of determining whether the child would be able to safely live with the parents." The *Marr* court quoted *Tenn. Dep't of Children's Services v. D.G.B.,* No. E2001-02426-COA-R3-JV, 2002 Tenn. App. LEXIS 647, 2002 WL 31014838 (Tenn. Ct. App. Sept. 10, 2002), as follows:

> In the instant case, the trial court found – and the evidence does not preponderate to the contrary – that "an early return to the *care* of their parents" was not possible. . . . This it seems to us is the key to this issue. The legislative intent is not simply to establish a "meaningful relationship" between a child and his or her parents; it is to return the child to the *care* of his parents.

*D.G.B.,* 2002 Tenn. App. LEXIS 647, at *26-27, 2002 WL 31014838 *quoted in Marr,* 2003 WL 152640, at *11. We then discussed the impact [on] the child of continuing the parent/child relationship with a parent who, through no fault of the parent, cannot care for the child:

> [T]he focus of the termination statute is on whether the child can safely live with the parent and have his, that is, the child's, day-to-day needs met. Some of the grounds, such as abuse of the child, are reasons for which the parent can be faulted. Other reasons, such as a parent's mental incompetence, are reasons for which the parent cannot be faulted, but the result nonetheless is that the child cannot safely live with the parent in such a way that the child's needs will be met. . . . For a child who is in foster care, failing to terminate the . . . parent's parental rights means that the child will spend his childhood in foster care, with no permanent home.

*Marr,* 2003 WL 152640, at *12 (internal citations omitted). Thus, we cannot ignore the legislative intent behind the termination statutes. Clearly, the legislature intended for the focus to be on achieving a permanent, safe home for children coming into the care of the State. In this case, continuation of the children's relationship with Mother and Father would prevent their adoption and mean that they would spend their childhood in

foster care, with no permanent home. That is substantial harm indeed. Therefore, we affirm the trial court's finding that termination of the parental rights of Mother and Father is in the best interests of [the children].

*Oliver*, 2007 WL 4553036, at *9-10.

In the case at bar, the trial court found that Mother was mentally incompetent such that she was unable to safely care for the Child. Mother suffered from delusions and was still unwilling or unable to accept her identity or her family at the conclusion of trial, despite DNA evidence proving a biological relationship between the Child and Maternal Grandparents. Expert testimony and a psychological evaluation of Mother's mental state indicated that Mother's mental illness would have a detrimental effect on the Child. Mother had made efforts to improve her mental condition, but her delusions persisted at the time of trial and were clear from her testimony. The trial court relied significantly on Mother's testimony, which evinced that her delusions still persisted.

In making its decision, the trial court found that the Child was bonded to her foster parents, who wished to adopt her, and that she was in a "trusting, secure place where her emotional needs [were] being met and where she [could] develop with a clear sense of reality." Following our thorough review of the record, we conclude that the evidence does not preponderate against the trial court's finding by clear and convincing evidence that termination of Mother's parental rights was in the Child's best interest.

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's judgment terminating Mother's parental rights to the Child. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below. Costs on appeal are assessed to the appellant, Penelope D.

_____
THOMAS R. FRIERSON, II, JUDGE